IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:16cr6 |
| | ) | |
| ANTHONY L. BURFOOT, | ) | The Honorable Henry C. Morgan, Jr. |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, through its undersigned counsel, hereby submits its trial brief in the above-captioned case.

## I.   Charges in the Indictment

On January 7, 2016, a Grand Jury sitting in Norfolk returned an eight-count indictment charging Anthony L. Burfoot with various crimes relating to his efforts to profit from his public service as a City Council member, Vice Mayor, and Chief Deputy Treasurer of the City of Norfolk.  The indictment charges Mr. Burfoot with one count of conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 1349; one substantive count of honest-services wire fraud, in violation of 18 U.S.C. § 1343; one count of conspiracy to commit extortion under color of official right (*i.e.*, "Hobbs Act extortion"), in violation of 18 U.S.C. § 1951; one substantive count of Hobbs Act extortion, in violation of 18 U.S.C. § 1951; and four counts of perjury, in violation of 18 U.S.C. § 1623.

The indictment alleges that Mr. Burfoot engaged in a multiyear scheme to profit from his public service by accepting cash payments, gifts, and other personal benefits in exchange for taking official government action.  All told, Mr. Burfoot allegedly received over $450,000

dollars in cash and other benefits as a result of his alleged misconduct.

More particularly, Counts I and II of the indictment charge that the defendant conspired to commit, and did commit, honest-services wire fraud. Count I alleges that from about 2005 through about February 2011, Mr. Burfoot conspired to use wire communications in interstate commerce for the purpose of executing a scheme to defraud the citizens of Norfolk of their right to his honest services through bribery, thereby violating 18 U.S.C. § 1349. The gravamen of Count I is that Mr. Burfoot sold his public positions to local real-estate developers and agreed with them to perform official acts in exchange for money. While the indictment explicitly identifies various developers and individual persons who participated in Mr. Burfoot's bribery scheme, it also makes clear that the conspiracy included other unnamed participants and involved additional wrongdoing.[1] Count II charges Mr. Burfoot with a substantive count of honest-services wire fraud in violation of 18 U.S.C. § 1343.

Counts III and IV of the indictment charge that Mr. Burfoot conspired to, and did, violate the Hobbs Act by unlawfully interfering with commerce by committing extortion—*i.e.*, "the obtaining of property from another, with his consent . . . under color of official right." 18 U.S.C. § 1951(a), (b)(2). In particular, Count III alleges that Mr. Burfoot knowingly and intentionally conspired with other persons to obtain property not due to him or his office. Count IV alleges that Mr. Burfoot committed Hobbs Act extortion by obtaining approximately $50,000 in payments and other things of value not due to him or his office.

Lastly, Counts V through VIII of the indictment allege that Mr. Burfoot committed

---

[1] See Indictment at 20 ¶ 2 (stating that "Anthony L. Burfoot knowingly and intentionally conspired with other persons known and unknown to commit wire fraud"); ¶ 4 (noting that the "manner and means by which the defendant would and did carry out the conspiracy included, but were not limited to the following . . . .").

perjury while under oath as a witness in the matter of United States v. Edward J. Woodard, et al., criminal action no. 2:12cr105, in the Eastern District of Virginia (the "Woodard trial"). All four counts relate to sworn testimony that Mr. Burfoot gave on May 6, 2013, as a defense witness in that proceeding. In particular, Mr. Burfoot testified that:

- He did not ask a person (identified in the indictment as TA) to give to another person (identified in the indictment as TS) $25,000 so that she could pay off her credit card bills (Count V);

- He did not tell TA that he would deliver the City Council votes needed to approve TA's special exception to operate a strip club in down Norfolk if TA gave TS $25,000 (Count VI);

- He has never solicited anything of value in exchange for an official act (Count VII); and

- He has never accepted anything of value in exchange for an official act (Count VIII).

The indictment alleges that at the time Mr. Burfoot made these four statements, he knew and believed them to be false in violation of 18 U.S.C. § 1623.

## II.    Anticipated Testimony and Evidence

The trial in this matter is scheduled to begin on November 7, 2016. At trial, the government plans to call numerous witnesses who will detail their own corrupt dealings with Mr. Burfoot. These witnesses will testify that the defendant agreed to undertake certain official actions in his role as City Councilman, Vice Mayor, and Deputy Treasurer in exchange for personal benefits. The government will corroborate these witnesses' accounts with video recordings of certain City Council meetings, and documentary records including bank, phone, and other records. This evidence will establish that Mr. Burfoot (i) engaged in a multiyear scheme to enrich himself by accepting bribes in exchange for official acts, and (ii) committed multiple counts of perjury by testifying falsely during the Woodard trial.

3

A.      **Evidence Relating to Bribes in Exchange for Official Acts**

The government's evidence will prove that Mr. Burfoot used his official positions to

enrich himself by soliciting and accepting money and other things of value from individuals with

interests before the City of Norfolk (the "City") in exchange for performing official actions.  The

indictment specifically identifies several of the benefits that Mr. Burfoot solicited and accepted,

including approximately $450,000 in cash payments, free home renovations, new kitchen

appliances, a Mercedes sedan, and a $25,000 payment to the mother of two of his children.[2]  The

indictment also identifies official actions that Mr. Burfoot promised to perform or did perform in

return for these bribes, including voting to authorize City expenditures and approving zoning

changes and development plans.[3]  Consistent with these allegations, the government will

introduce evidence at trial relating to several different *quid pro quo* relationships between

Mr. Burfoot and persons with business before the City.

1.      **The *Quid pro Quo* Relationship with Tivest**

*First*, the government will introduce evidence regarding Mr. Burfoot's illicit relationships

with several real-estate developers, including persons identified in the indictment as DE, CE, and

RL, as well as the real-estate development company Tivest.[4]  This evidence will include

testimony relating to three principle development projects:  the Broad Creek Villas project, the

Broad Creek redevelopment project, and the MidTown Office Tower project.

In 2004, Mr. Burfoot became a "silent" partner in Tivest.  At the time, he promised his

---

[2] See id. ¶¶ 12–13, 16–17, 22, 29, 50–51, 54, 56, 60, 77.

[3] See, e.g., id. ¶¶ 2, 16, 35, 40–43, 50, 53, 61, 72, 88.

[4] As explained in the indictment, "Tivest" refers generally to a collection of separate entities, including (i) Tivest Development and Construction, LLC, (ii) Tivest Holdings, LLC, (iii) Tivest Developments, LLC, and (iv) Tivest Development, LLC.  (See id. ¶ 4.)

partners that he would use his position as a Norfolk Councilman to direct City projects and other benefits to Tivest.  A year later, Mr. Burfoot became concerned that his association with Tivest might be discovered so he told his partners that he intended to "cash out" of Tivest, and he demanded $250,000 for his interest in the company.  He also threatened that Tivest would not be awarded an upcoming development project, known as the Broad Creek Villas, unless his demand was met.

### a.    The Broad Creek Villas Project

The Broad Creek Villas project was a mixed-use construction project in the Broad Creek neighborhood of Norfolk.  The government will introduce evidence that CE and DE ultimately paid Mr. Burfoot hundreds of thousands of dollars in exchange for performing official actions, including voting in favor of specific ordinances relating to the Broad Creek Villas project.  For example, on July 22, 2008, Mr. Burfoot voted to approve an ordinance authorizing the City of Norfolk to enter into a contract with Tivest for the Broad Creek Villas project.  This ordinance permitted the City of Norfolk to convey City land to Tivest for free, and to pay Tivest $200,000 for infrastructure improvements to the project.

### b.    The Broad Creek Redevelopment Project

Around this same time, the Norfolk Redevelopment and Housing Authority (or "NRHA") was administering a U.S. Housing and Urban Development (or "HUD") grant also aimed at redeveloping the Broad Creek neighborhood.  The government will introduce evidence that Mr. Burfoot also solicited money from DE by promising to exert pressure on NRHA officials to award Tivest some of the projects funded by this grant.  And in fact, Tivest was awarded dozens of single and multi-family home construction projects by the NRHA.

### c.      The MidTown Office Tower Project

Finally, the government will introduce evidence showing that Mr. Burfoot accepted $50,000 in bribes and other benefits in relationship to another matter before the City, the MidTown Office Tower project.  As part of the project, Tivest wanted the City to provide the necessary land—assessed at a value of $990,800—at no cost, to pay $500,000 for infrastructure improvements, and to award Tivest a $490,000 performance-based grant.  On November 18, 2008, at Burfoot's request, DE made a $1,000 payment on Burfoot's car loan at NAE Federal Credit Union.  One week later, Mr. Burfoot voted to approve an ordinance related to the MidTown Office Tower that satisfied Tivest's objectives.

Even so, Tivest had difficulty locating a bank to finance the $23 million project.  As a result, the Tivest principals continued to ask the Norfolk City Council for special concessions to satisfy a potential lender.  Mr. Burfoot continued to assist DE in these matters, but only in exchange for a portion of the funds that Tivest would receive when it ultimately closed on the MidTown Office Tower.  Mr. Burfoot's requested kickback gave him a direct financial interest in the successful completion of the MidTown Office Tower project.

The government will also introduce evidence proving that Mr. Burfoot committed honest-services wire fraud as part of his illicit activity relating to the MidTown Office Tower project.  In February of 2011, Tivest faced political fallout when it became public that Tivest owed Norfolk unpaid property taxes of at least $32,600.  The evidence will show that Mr. Burfoot warned DE that Tivest needed to pay its delinquent taxes prior to another City Council vote on the project scheduled for February 15, 2011.  Mr. Burfoot also called an employee of the City Treasurer's office and instructed the employee to prepare Tivest's delinquent tax bills, totaling approximately $32,600, so that DE could pay them on February 14, 2011.  On or about

February 14, 2011, Tivest delivered a check for $22,554.04 to the City that partially satisfied its delinquent tax bill.  On or about February 14, 2011 at 8:44 a.m., because Tivest did not have sufficient funds to cover the entire delinquent tax bill, DE paid the remaining $10,121.04 delinquent tax bill using DE's sister's credit card.  The credit card payment caused the transmission of a wire communication in interstate commerce in support of Mr. Burfoot's scheme to deprive the citizens of Norfolk of his honest services.

Tivest's payment of the delinquent taxes using DE's sister's credit card paved the way for defendant to ensure that Tivest would receive five votes in favor of enhanced City participation in the MidTown Office Tower project.  On February 15, 2011, Mr. Burfoot duly voted to approve an ordinance that authorized the City to guarantee a portion of the lease of the project's anchor tenant.  The ordinance passed in a 5-to-3 vote, and at least one member of Council who voted in favor of the project would not have voted in favor of the ordinance if Tivest's unpaid taxes remained delinquent.  Prior to voting, Mr. Burfoot did not disclose his past involvement with Tivest, nor did he disclose the expected payday he would derive from Tivest's closing on the MidTown Office Tower.

### 2. The *Quid pro Quo* Relationship with TA

*Second*, the government will introduce evidence proving an illicit relationship between Mr. Burfoot and a developer identified in the indictment as TA.  From 2006 through 2009, TA developed a condominium project known as Widgeon Pointe in Norfolk.  The defendant asked TA to loan his ex-girlfriend and the mother of two of his children, TS, $25,000 so that she could purchase a Widgeon Pointe condominium.  When TA declined, Mr. Burfoot suggested that TA should give TS the money outright and, in exchange, he would support TA's efforts to get City approval to open a proposed gentleman's club—the Granby Cabaret—on Granby Street.

7

The evidence will show that Mr. Burfoot ultimately publicly withdrew his support for the opening the Granby Cabaret, but privately assured TA that the matter was simply on the back-burner.  As a result, TA authorized a series of transactions between August and October of 2009 in which he provided TS with the promised $25,000 payment.  Nearly a year later, the defendant agreed to assist TA with various official matters, including voting to approve signage for TA's new country-and-western bar on Granby Street.

### 3.	The *Quid pro Quo* Relationship with RB

*Third*, the government will introduce evidence proving an illicit relationship between Mr. Burfoot and RB, another local real-estate developer and businessman.  Starting in March 2004, RB regularly asked Mr. Burfoot to use his official position to support RB's interests on matters before the Norfolk City Council.  As one example, Anthony Burfoot assisted RB by ensuring that a particular individual was removed from the Board of Commissioners for the NRHA.  In exchange, the defendant demanded and received cash payments, undocumented, no-interest "loans" which he never repaid, and unfettered access to RB's beach house in the Outer Banks.  To conceal his relationship with RB, the defendant repeatedly claimed that he owned the beach house.  Indeed, several women will testify that they visited this beach house with Mr. Burfoot, and that they were under the impression that Mr. Burfoot owned the house.

### B.	Evidence Relating to Perjury

The government will also introduce evidence proving that the defendant perjured himself while testifying during the Woodard trial.  On March 26, 2013, TA testified as a witness in that proceeding.  He told the jury that, as summarized above, Mr. Burfoot solicited $25,000 from him to support TS's purchase of a Widgeon Pointe condominium.  On May 6, 2013, the defendant

testified under oath as a defense witness during the same trial.[5]  Under cross-examination by the government, the defendant denied knowing that TS wanted to purchase the condominium and denied asking TA to give TS the $25,000 in exchange for delivering votes to approve TA's gentlemen's club.  In addition, Mr. Burfoot provided the following testimony:

Q:      [Didn't you ask [TA] to give [TS] $25,000 so that she could pay off her credit card bills?

A:      No, I did not.

\*       \*       \*

Q:      You told [TA] that you would deliver your City Council vote along with three other votes which would approve [TA]'s license to operate a strip club in downtown Norfolk if he gave [TS] $25,000?

A:      I did not.

\*       \*       \*

Q:      Mr. Burfoot, have you ever solicited anything of value in exchange for an official act?

A:      I have not.

\*       \*       \*

Q:      Mr. Burfoot, have you ever accepted anything of value in exchange for an official act?

A:      I have not.

The government's evidence will show that at the time Mr. Burfoot made these four statements, he knew and believed them to be false, thereby violating 18 U.S.C. § 1623.

---

[5] The United States previously submitted a transcript of the defendant's testimony during the Woodard trial as an exhibit to its response to the defendant's motion to dismiss perjury counts VII and VIII.  See ECF No. 54-1 (Mar. 8, 2016).

III.     **Bases for the Admissibility of the Government's Anticipated Evidence**

Given the volume of evidence likely to be introduced during the upcoming trial, the government believes it might be helpful to the Court to preview its key evidence and to summarize the basis for its admissibility.

A.     **Rule 404(b) Evidence**

On October 24, 2016, the government identified for the defendant specific evidence that it intends to introduce at trial because it is intrinsically related to the charged crimes and conduct. See, e.g., United States v. Basham, 561 F.3d 302, 326 (4th Cir. 2009) ("Evidence of uncharged conduct is not other crimes' evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." (quoting United States v. Siegel, 536 F.3d 306, 316 (4th Cir. 2008) (second set of internal quotation marks omitted)).  However, should the Court disagree with the government's position, it will seek to introduce the same evidence at trial as the defendant's prior acts under Federal Rule of Evidence 404(b).

That Rule states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The Rule nonetheless specifies that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

The Fourth Circuit has stated that "[b]ecause [Rule 404(b)] recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception, it is understood to be a rule of inclusion, authorizing evidence of prior acts for purposes other than character, such as motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997) (internal quotation marks and citations

omitted).  Queen recognized that "[e]xtrinsic acts evidence may be critical to the establishment

of the truth as to a disputed issue, especially when that issue involves the actor's state of mind

and the only means of ascertaining that mental state is by drawing inferences from conduct."  Id.

at 996 (quoting Huddleston v. United States, 485 U.S. 681, 685 (1988)).

      Queen set out a four-part test to identify when "other acts" evidence is admissible under

Rule 404(b)(2):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant.  In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes.  (2) The act must be necessary in the sense that it is probative of an essential claim or an essential element of the offense.  (3) The evidence must be reliable.  And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

      Id. at 997.  Here, should the Court disagree with the government's position that certain

evidence is intrinsic to the crime, the government intends to introduce 404(b) evidence of

additional instances of conspiracy and Hobbs Act extortion, all of which is relevant for the

permissible purpose of proving the defendant's motive, intent, plan, knowledge, absence of

mistake, and *modus operandi* because it involves the same type of misconduct alleged in the

indictment.  For example, as detailed above, the government intends to present evidence that the

defendant and RB engaged in a *quid pro quo* relationship wherein RB provided Mr. Burfoot with

things of value in exchange for Mr. Burfoot agreeing to perform and actually performing official

actions to benefit RB's interests.

This proposed 404(b) evidence satisfies the four <u>Queen</u> requirements—*i.e.*, that the evidence be relevant, necessary, reliable, and not substantially more prejudicial than probative. 132 F.3d at 997.

*First*, the proposed 404(b) evidence is highly relevant with respect to Mr. Burfoot's intent, plan, knowledge and absence of mistake.  The evidence demonstrates that, far from engaging in innocent interactions with constituents, the defendant engaged in a multiyear pattern of selling official actions in exchange for personal benefits.  The Fourth Circuit has underscored that prior-act evidence is admissible when it illustrates the defendant's "typical pattern" of wrongdoing.  <u>See, e.g.</u>, <u>United States v. Siegel</u>, 536 F.3d 306, 318 (4th Cir. 2008) (affirming the admission of evidence under Rule 404(b) to show that the defendant repeatedly engaged in similar acts of fraud, thereby "establish[ing] a *modus operandi*").  The proposed prior-act evidence here is relevant for the same reason.

*Second*, the evidence is clearly necessary as it goes directly to satisfying an element of the charged offenses:  intent.  As the Fourth Circuit has stated, "[a] not guilty plea puts one's intent at issue and thereby makes relevant evidence of similar prior crimes when that evidence proves criminal intent."  <u>United States v. Van Metre</u>, 150 F.3d 339, 350 (4th Cir. 1998); <u>United States v. Hernandez</u>, 975 F.2d 1035, 1039 (4th Cir. 1992) ("It is a truism that a plea of 'not guilty' to a charge requiring intent places that mental state in issue and that the state may offer evidence of other bad acts to address that issue.").  Here, the government anticipates that Mr. Burfoot will argue that he had no corrupt intent at all in his dealings with real-estate developers and others who provided him with cash, gifts, and other benefits.  Evidence of Mr. Burfoot's additional misconduct is relevant to rebutting these arguments and to demonstrating that the defendant purposefully sought to enrich himself by selling his services as

a public official.  As <u>Queen</u> itself underscored, "[t]he more similar the extrinsic act or state of

mind is to the act involved in committing the charged offense, the more relevance it acquires

toward proving the element of intent."  132 F.3d at 996.  Here, the government's proposed

404(b) evidence demonstrates a consistent pattern of exchanging official actions for personal

gain.

    *Third*, the proposed 404(b) evidence is highly reliable.  Much of this evidence, for

example, will be in the form of live, in-person testimony from real-estate developers who

personally gave the defendant cash and other things of value in exchange for official acts.  While

the defendant will no doubt challenge the credibility of the government's witnesses, the Fourth

Circuit has explained that "reliability is not synonymous with credibility when dealing with

404(b) evidence" and that it is ultimately "for the jury to determine if [witnesses] [are] telling the

truth."  <u>United States v. Bailey</u>, 990 F.2d 119, 123 (4th Cir. 1993).  Moreover, "[t]estimony is

not unreliable simply because it is in conflict with or contradicted by other testimony.  Nor is it

unreliable because the witness has an unsavory past.  These are merely circumstances for the jury

to consider."  <u>Id.</u>; <u>see also</u> <u>Queen</u>, 132 F.3d at 998 (rejecting the defendant's argument that

testimony pursuant to a plea agreement is necessarily unreliable).

    *Fourth*, the proposed 404(b) evidence is not substantially more prejudicial than probative.

Indeed, it is not unfairly prejudicial at all.  <u>Queen</u> explained that evidence should be excluded as

unfairly prejudicial only when it tends to cause "confusion" or "to subordinate reason to emotion

in the factfinding process."  132 F.3d at 997.  These dangers are not present here.  Instead, the

government will be asking the jury to reach an entirely appropriate conclusion based on

permissible inferences—*i.e.*, that the defendant's sustained pattern of self-enrichment

demonstrates his clear intent to exchange official actions for personal benefits.  To the extent

there is any possibly of juror confusion between prior-act evidence and the conduct charged in the indictment—and the government doubts that there will be—the Court can eliminate such confusion by giving an appropriate limiting instruction. See id. (stating that "[a]ny potential for confusion that the prior acts were the actual acts charged in this case was certainly eliminated by the court's instruction to the jury").

Accordingly, the United States believes that any proposed 404(b) evidence is admissible under the Rules of Evidence and this Circuit's governing precedents.

### B. Admissibility of Summary Charts

The government intends to present several summary charts to prove the content of voluminous documents that cannot be conveniently examined in court. Federal Rule of Evidence 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[6]

Longstanding precedent in this Circuit establishes that "[s]ummary charts are admissible if they aid the jury in ascertaining the truth." United States v. Loayza, 107 F.3d 257, 264 (4th Cir. 1997) (citing United States v. Johnson, 54 F.3d 1150, 1156 (4th Cir. 1995)). Because cases involving honest-services fraud, Hobbs Act extortion, and similar offenses often involve numerous financial transactions, payments, and kickbacks, it is not uncommon for the government to introduce summary charts in such cases in order to assist the jury. See, e.g., United States v. Whitfield, 590 F.3d 325, 365 (5th Cir. 2009) (finding no abuse of discretion where the district court admitted summary charts that "synthesized bank records and checks" that

---

[6] Rule 1006 further requires the proponent to "make the originals or duplicates available for examination . . . at a reasonable time and place."

demonstrated "the transfer of money" between participants in the conspiracy); United States v. Massey, 89 F.3d 1433, 1441 (11th Cir. 1996) (in a case involving bribery and other offenses, finding no error in the admission of summary charts detailing thousands of dollars in meals that the defendant purchased for a public official); United States v. Evans, 910 F.2d 790, 800 (11th Cir. 1990), aff'd, 504 U.S. 255 (1992) (in a case involving attempted Hobbs Act extortion under color of official right, finding no abuse of discretion where the district court admitted a summary chart detailing the defendant's finances).

Here, the summary charts detail phone calls between the defendant and others in connection with certain City Council meetings and other events, as well as cash withdrawals and deposits into certain bank accounts.   The government disclosed these summary charts on October 24, 2016, and notified the defendant on that same day that all documentary evidence underlying these summary charts had already been produced in discovery.   Accordingly, the government intends to call two FBI employees to testify at trial regarding their preparation of these charts, and will seek to admit the summary charts as evidence in this case.

## C.     Authentication of Documentary Evidence and Application of the Hearsay Rules

As a condition precedent to the admission of evidence, the proponent of that evidence must satisfy the requirements for authentication.  To do so, Federal Rule of Evidence 901 requires the United States to "produce evidence sufficient to support a finding that the item is what [the United States] claims it is."  The Fourth Circuit has explained that "[t]he burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required."  United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009).  That is because "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for

15

the jury." Id. (citing United States v. Branch, 970 F.2d 1368, 1370 (4th Cir. 1992)).  The most common way to authenticate a piece of evidence is through testimony by a witness with sufficient knowledge that the matter is what it is claimed to be.  Fed. R. Evid. 901(b)(1).  Many of the documents the United States will seek to introduce will be authenticated through that method.

In addition, the government will seek to introduce various public records relating to matters before the Norfolk City Council.  Rule 901(b)(7) states that the government may authenticate such a record by producing evidence that the "document was recorded or filed in a public office as authorized by law," or that it "is from the office where items of this kind are kept."[7]  Alternatively, certain kinds of public records are self-authenticating under Rule 902 and therefore "require no extrinsic evidence of authenticity in order to be admitted."  These include records that bear the seal of "a political subdivision" of "any state" and "a signature purporting to be an execution or attestation," Fed. R. Evid. 902(1), and public records that bear no seal but bear an official signature of an officer or employee of the political subdivision, so long as "another public officer who has a seal and official duties within that same entity certifies under seal—or its equivalent—that the signer has the official capacity and that the signature is genuine," Fed. R. Evid. 902(2).

Several evidentiary issues that may arise during trial involve application of the hearsay

---

[7] Under this rule, "the 'proponent of the evidence need only show that the office from which the records were taken is the legal custodian of the records,'" which may be accomplished "by '[a] certificate of authenticity from the public office; [t]he testimony of an officer who is authorized to attest to custodianship, [or] the testimony of a witness with knowledge that the evidence is in fact from a public office authorized to keep such a record.'"  Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534, 548 (D. Md. 2007) (quoting 5 Weinstein's Federal Evidence § 901.10[2]).

rules.  The government previews these issues below.

### 1.        Statements of the Defendant Himself

The government will introduce many statements made by Mr. Burfoot himself, both publicly and to his coconspirators.  Such statements are admissions of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A).[8]

### 2.        Statements of Employees and Agents of the Defendant

In his role as City Councilman, Vice Mayor, and Deputy Treasurer of the City of Norfolk, Mr. Burfoot had substantial authority over numerous City employees.  Some of these relationships involved City employees who reported to Mr. Burfoot directly, while others were more informal.  The government will seek to introduce various statements made by the defendant's employees and agents under Federal Rule of Evidence 801(d)(2)(D), which excludes statements from the definition of hearsay when they are "made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed."

As the party seeking to admit such statements, the government must offer "independent evidence establishing the existence of the agency."  United States v. Portsmouth Paving Corp., 694 F.2d 312, 321 (4th Cir. 1982).  Importantly, "specific authorization to speak need not be shown," because the fact that "the statement is made within the scope of the agency is sufficient."  Id.  Consistent with this principle, even "a statement of illegal activity can still be

---

[8] Rule 801(d)(2)(A) excludes from the definition of hearsay any statement "offered against an opposing party" and "made by the party in an individual or representative capacity."  When testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," United States v. Wills, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," id. (quoting United States v. Lemonakis, 485 F.2d 941, 948 (D.C. Cir. 1973)).

within the scope of employment and can be admissible under 801(d)(2)(D)." <u>United States v. Riley</u>, 621 F.3d 312, 338 (3d Cir. 2010), <u>as amended</u> (Oct. 21, 2010) (citing <u>Cline v. Roadway Express, Inc.</u>, 689 F.2d 481, 488 (4th Cir. 1982)). Given that the Federal Rules of Evidence do not define the scope of an agency relationship, courts in this Circuit have occasionally looked to the relevant treatises. <u>See, e.g.</u>, <u>Quesenberry v. Volvo Grp. N. Am., Inc.</u>, 267 F.R.D. 475, 483 (W.D. Va. 2010) (stating that "[a]n agent is 'a person authorized by another to act on his account and under his control'" (quoting Restatement (Second) of Agency § 1 cmt. e (1958))). In any event, whether an agency relationship exists in any given case is a fact-bound determination that depends on the circumstances. The key factor is whether the purported principal exercised control over the declarant.

In this case, the government will offer statements from various persons who acted as either employees or agents of the defendant. For example, an employee of the City Treasurer's Office will testify that Mr. Burfoot directed her to respond to an inquiry by a Virginian Pilot reporter, and to provide misleading information to that reporter about Tivest's payment of its delinquent taxes. Specifically, the employee will testify that Mr. Burfoot directed her to tell the reported that Tivest paid the taxes either Friday or Monday, even though Mr. Burfoot and the employee knew the taxes had been paid four hours earlier. Such statements satisfy the requirements of Rule 801(d)(2)(D).

Such statements are even admissible where Mr. Burfoot may not have exercised formal control over the declarants as their direct supervisor. For example, in <u>United States v. Summers</u>, 598 F.2d 450 (5th Cir. 1979), the Fifth Circuit concluded that certain statements made in relation to a Hobbs Act scheme orchestrated by the defendant—a public official—were admissible as statements of the defendant's agent. The defendant there was a city councilman and the

declarant was a member of the local water and sewer board.  As a result, there was no formal

employer-employee relationship between the two.  Even so, the Fifth Circuit determined that the

defendant "made [the declarant] his agent for the purpose of extracting money" by instructing the

declarant to convey certain messages in relation to an ongoing kickback scheme.  Id. at 458.

Here, too, Mr. Burfoot made certain people his agents "for the purpose of extracting money."

Accordingly, these statements satisfy the requirements of Rule 801(d)(2)(D), even in the absence

of an employer-employee relationship, and are therefore not hearsay.

### 3.      Statements in Furtherance of the Conspiracy

Many of the statements that the United States intends to introduce are statements by

coconspirators of Mr. Burfoot made during and in furtherance of the conspiracy.  Under Federal

Rule of Evidence 801(d)(2)(E), such statements are excluded from the definition of hearsay.

In order to admit coconspirator statements under Rule 801(d)(2)(E), the government

"must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were

members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance,

of the conspiracy."  United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013) (quoting United

States v. Pratt, 239 F.3d 640, 643 (4th Cir. 2001)).  Each of these three factors "must be

supported by a preponderance of the evidence."  Id. (citing United States v. Blevins, 960 F.2d

1252, 1255 (4th Cir. 1992)).  The Fourth Circuit has explained, however, that district courts are

not required "to hold a hearing to determine whether a conspiracy exists before admitting

statements under the rule."  Id.  Instead, a reviewing court will affirm a district court's judgment

"where the record reveals that the co-conspirator's statements were plainly admissible, whether

or not a detailed rationale for admitting the statements had been stated by the trial court."  Id.

(quoting Blevins, 960 F.2d at 1256).

In support of the admission of coconspirator statements, the government will introduce evidence sufficient to support a finding as to each of the three necessary factors.  Importantly, the Fourth Circuit has stated that "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect."  United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) (quoting United States v. Shores, 33 F.3d 438, 443 (4th Cir. 1994)).  In addition, the Fourth Circuit has construed the requirement that the proffered statements be made in support of the conspiracy "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception."  Id. (quoting 5 Weinstein's Federal Evidence §§ 801.34[5], 801–89).

In this case, the government intends to introduce numerous coconspirator statements made in support of the defendant's ongoing efforts to commit honest-services fraud and Hobbs Act extortion under color of official right.  Given that several of the government's witnesses were intimately involved in the defendant's self-enrichment schemes, the government will be able to provide the necessary foundation for the statements' admissibility.

It is worth acknowledging that, in some multi-defendant cases involving more than one conspiracy, confusion may sometimes arise regarding whether *particular* statements are admissible under Rule 801(d)(2)(E) as to *particular* defendants.  See, e.g., United States v. Morrow, 39 F.3d 1228, 1235 (1st Cir. 1994) (concluding that where the government failed to show that the conspirators agreed on multiple objectives, "[i]t [was] therefore likely true that some of the hearsay relating to the first fraud and admitted against [one defendant] was not, as to him, covered by the co-conspirator exception to the hearsay rule").  Importantly, however, this is not an issue in the present case.  It is true that the defendant entered multiple, sometimes overlapping conspiracies with several real-estate developers to profit from his public service.

Even so, the fact that Mr. Burfoot may have been involved in *additional* conspiracies beyond the honest-services wire fraud conspiracy and the Hobbs Act extortion conspiracy charged in Counts I and III of the indictment does not create an evidentiary problem at trial.  See, e.g., United States v. Marino, 277 F.3d 11, 25–26 (1st Cir. 2002) ("[A]nother conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements.").

What's more, every conspiracy in which the defendant participated was part of a single scheme—*i.e.*, enriching himself in exchange for taking official acts.  As a result, *any* coconspirator statement that the government seeks to introduce under Rule 801(d)(2)(E) should be admissible against the defendant, because the government will provide the requisite foundation as to each and every conspiracy in which Mr. Burfoot participated.

### 4.     Prior Consistent Statements

The government expects that the defendant will attack the credibility of many of its witnesses, particularly those who actively conspired with Mr. Burfoot in his efforts to commit honest-services fraud and extortion under color of official right.  In these circumstances, the government may seek to admit certain statements as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B).  That rule provides that a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered . . . [either] (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when

attacked on another ground."[9]  In addition to these two rationales, the Fourth Circuit has held

that prior consistent statements are also admissible under the so-called Doctrine of Completeness

if "other portions of the same statement have been used to impeach the witness, such that

'misunderstanding or distortion can be averted only through presentation of another portion' of

the statement."  United States v. Hedgepeth, 418 F.3d 411, 422 (4th Cir. 2005) (quoting United

States v. Mohr, 318 F.3d 613, 626 (4th Cir. 2003)).  A prior consistent statement is generally

only admissible as substantive evidence "if the statement was made prior to the time the

supposed motive to falsify arose."  United States v. Henderson, 717 F.2d 135, 138

(4th Cir. 1983).

    The government appreciates that "[t]he prior consistent statements of a witness are, as a

general proposition, inadmissible as substantive evidence," Hedgepeth, 418 F.3d at 422.

Accordingly, it will only seek to offer such statements as evidence if necessary (i) to rebut

charges of fabrication, (ii) to respond to attacks on a witness's credibility, or (iii) to provide the

jury with an accurate sense of the witness's prior statements consistent with the Doctrine of

Completeness.

    Importantly, when proving the existence of a prior consistent statement, the government

may rely on extrinsic evidence.  To put it another way, the government may choose to

---

[9] Subpart (ii) appears in the rule as the result of a 2014 amendment to the Federal Rules of
Evidence.  The addition of subpart (ii) expands the prior rule, which "did not, for example,
provide for substantive admissibility of consistent statements that are probative to explain what
otherwise appears to be an inconsistency in the witness's testimony," or to "rebut a charge of
faulty memory."  Advisory Comm. Notes to 2014 Amendments.  In other words, "[t]he intent of
the amendment is to extend substantive effect to consistent statements that rebut other attacks on
a witness."  Id.  The precise scope of the modified rule is not yet settled.  See, e.g., United States
v. Ledbetter, No. 2:14-cr-127 (ALM), 2016 WL 2346796, at *1 (S.D. Ohio May 4, 2016) (stating
that "the scope of the newly enacted Rule 801(d)(1)(B)(ii) remains somewhat of a mystery to
courts and commentators").

rehabilitate a witness against a charge of fabrication *either* by eliciting evidence of a prior

consistent statement on redirect examination, *or* by eliciting testimony from another witness who

was present when the prior consistent statement was made.

Two cases from the Fourth Circuit are especially instructive on this point.  In United

States v. Henderson, 717 F.2d 138 (4th Cir. 1983), a bank robbery case, the government elicited

testimony from a cooperating witness who identified the defendant as one the robbers.  On cross-

examination, defense counsel suggested that the witness was fabricating testimony in exchange

for a plea bargain.  Seeking to rehabilitate the witness, the government invoked Rule

801(d)(1)(B), *both* "by successfully refreshing [the witness's] memory [about prior consistent

statements] on redirect examination" *and* by asking another witness, an FBI agent, about those

same statements.  Id. at 138.  The defendant challenged the admission of the statements on

appeal, but the Fourth Circuit concluded that their admission was appropriate.  In doing so, it

stated that that "prior consistent statements made to government officers" are, in fact, often

admissible when made before plea bargains are finalized.  Id. at 139.  While the Fourth Circuit

suggested that eliciting testimony about the prior consistent statement both from the declarant

and from a third party might have been "cumulative," it also said that it was "not error" under

Rule 801(d)(1)(B).  Id.

The Fourth Circuit's decision in United States v. Dominguez, 604 F.2d 304 (4th Cir.

1979), is also illustrative.  The government's key witness in that case agreed to go undercover in

order to gather evidence against a drug smuggling operation.  After the witness's credibility was

attacked during cross-examination, the government introduced the witness's prior consistent

statements through the testimony of "a special agent of the United States Customs Service . . .

[who] repeated statements made to him by [the witness] during the course of [his] undercover

work on the case." Id. at 311. The defendants challenged the admission of these statements on appeal, but the Fourth Circuit said that the agent's testimony "was precisely the kind of testimony which is permitted by Rule 801(d)(1)." Id.

Indeed, other cases demonstrate that evidence of prior consistent statements need not come in the form of witness testimony at all. Instead, the government can introduce such evidence through audiotapes, as in United States v. Obayagbona, 627 F. Supp. 329, 337 (E.D.N.Y. 1985), or through documents like emails, as in MBIA Insurance Corp. v. Patriarch Partners VIII, LLC, No. 09-cv-3255 (RWS), 2012 WL 2568972, at *5 (S.D.N.Y. July 3, 2012). The bottom line is this: once rehabilitation of a witness through Rule 801(d)(1)(B) is proper, the government has wide latitude in deciding when and in what manner to introduce evidence of prior consistent statements. Accordingly, the government may seek to introduce evidence of prior consistent statements through various means in the upcoming trial, just as Rule 801(d)(1)(B) allows.

### 5. Admissibility of Public Records

As discussed earlier, the government will seek to introduce various public records regarding matters before the Norfolk City Council. These include both draft and enacted ordinances, as well as minutes and videotapes of City Council meetings. This evidence is admissible under the public records exception to the hearsay rule, Federal Rule of Evidence 803(8). Under that rule, "[a] record or statement of a public office" is an exception to the hearsay rule if it sets out "the office's activities" or "a matter observed while under a legal duty to report," provided that "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(i)–(ii), (B).

The Fourth Circuit has clarified that "[t]he admissibility of a public record specified in

the rule is assumed as a matter of course . . . unless there are sufficient negative factors to indicate a lack of trustworthiness."  Zeus Enters., Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999) (citing Ellis v. Int'l Playtex, Inc., 745 F.2d 292, 301 (4th Cir. 1984)).  In other words, "Rule 803(8) 'is not a rule of exclusion, but rather is a rule of admissibility' as long as the public record meets the requirements of the rule."  Id. (quoting Fred Warren Bennett, Federal Rule of Evidence 803(8):  The Use of Public Records in Civil and Criminal Cases, 21 Am. J. Trial Advoc. 229, 232 (1997)).  Other courts have had little trouble applying Rule 803(8) to admit materials relevant to the proceedings of city councils, including videos of city council meetings.  See Oriental Health Spa v. City of Fort Wayne, 864 F.2d 486, 491 (7th Cir. 1988) ("As an official public record of the City Council proceedings, the videotape would have been admissible at trial and could properly be considered on motion for summary judgment.").  The government contends that the public records it will offer in this case are, like the videos in Oriental Health Spa, admissible under Rule 803(8).

### 6.    Admissibility of Business Records

During the course of this trial, the government will seek to introduce various business records.  To satisfy the relevant hearsay exception—Federal Rule of Evidence 803(6)—a document "must be '(1) made by a regularly conducted business activity, (2) kept in the regular course of that business, (3) the regular practice of that business to make the memorandum, (4) and made by a person with knowledge or from information transmitted by a person with knowledge.'"  United States v. Cone, 714 F.3d 197, 219 (4th Cir. 2013) (quoting Clark v. City of L.A., 650 F.2d 1033, 1036–37 (9th Cir. 1981) (second set of internal quotation marks

omitted)).[10]

As authorized by Rule 803(6), the United States will establish the authenticity of many of the business records at issue in this case and their admissibility under Rule 803(6), through certifications obtained from the custodians of records, as contemplated by Rule 803(6).  As seen above, the rule references Rule 902(11).  Rule 902(11) provides for the authenticity of the following:

> (11) Certified Domestic Records of Regularly Conducted Activity – The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record –
>
> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
>
> (B) was kept in the course of the regularly conducted activity; and
>
> (C) was made by the regularly conducted activity as a regular practice.
>
> A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

As required by this Rule, on October 27, 2016, the government filed a written notice to counsel of its intention to introduce evidence at trial of certain domestic records of regularly conducted activity that would be admissible under Federal Rule of Evidence 803(6), and that these records are accompanied by a written declaration of their custodian or other qualified person and said declarations are made under penalty of perjury.  At that time, the government also informed counsel that the original affidavits were available for inspection.

Moreover, the United States anticipates offering into evidence emails authored by various individuals who are not Mr. Burfoot's coconspirators.  Some of these authors will testify, while others will not.  With the proper foundation, these emails are admissible as business records.[11]

In <u>Cone</u>, the Fourth Circuit stated that "properly authenticated e-mails may be admitted into evidence under the business records exception."  <u>Id.</u> at 220.  The Fourth Circuit was careful to note, however, that "it would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then *ergo* all those e-mails are business records falling within the ambit of Rule 803(6)(B)."  <u>Id.</u>  Instead, the Fourth Circuit favorably quoted a case from the District of Maryland, <u>It's My Party, Inc. v. Live Nation, Inc.</u>, No. 09-cv-547 (JFM), 2012 WL 3655470 (D. Md. Aug. 23, 2012), to the effect that "more specificity is required regarding the party's recordkeeping practices to show a particular email in fact constitutes a reliable business record."  <u>Id.</u> at *5.

Here, the government will offer email evidence related to communications of City employees, as well as NRHA employees.  For example, the government will introduce an email sent on March 17, 2006 to Mr. Burfoot from an NRHA employee which contained meeting notes, and a spreadsheet entitled "who gets which [Broad Creek] lots: per Shurl and Councilman Burfoot: March 16, 2006."   In support of the admission of such evidence, the government will

---

[10] Rule 803(6) contains two additional requirements, including that the prerequisites to admission be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification," and that "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(D)–(E).

[11] These statements may also be admissible, as described above, as statements made by the defendant's employees and agents under Federal Rule of Evidence 801(d)(2)(D).

establish a sufficient foundation to support application of Rule 803(6).  Consistent with <u>Cone</u>, this evidence will go beyond a blanket assertion that all the offered emails are necessarily business records, and will instead satisfy the enumerated requirements of Rule 803(6).

### 7.      Admissibility of Key Newspaper Articles

At various points throughout the time period described in the indictment, Mr. Burfoot reacted to articles published in the *Virginian Pilot* newspaper by communicating with other coconspirators or taking certain actions in furtherance of his self-enrichment scheme.  In order to assist the jury in understanding these actions, the government believes it would be helpful to introduce these articles as evidence.  The government seeks to do so not to establish the truth of the matter asserted *within* the articles, but rather to help explain what actions Mr. Burfoot and others took in *response* to their publication.

The Fourth Circuit has recognized that evidence that might otherwise constitute hearsay may be admitted for purposes other than proving its truth, including "to prove the extent of . . . a recipient's notice of certain conditions."  <u>Cone</u>, 714 F.3d at 219 (quoting 5 Weinstein's Federal Evidence § 801.11[5][a]).  Consistent with this principle, several courts have admitted newspaper articles for non-truth purposes where such evidence is otherwise relevant.  So, for example, in <u>Marsee v. U.S. Tobacco Co.</u>, 866 F.2d 319 (10th Cir. 1989), a liability suit against a manufacturer of smokeless tobacco, the district court admitted various articles from scientific journals regarding the dangers of smokeless tobacco use.  The Tenth Circuit explained that such articles were properly admitted for the non-truth purpose of "of determining if [the defendant] had notice of the hazardous character of its product."  <u>Id.</u> at 326.

Another case, <u>United States v. Scarpa</u>, 913 F.2d 993 (2d Cir. 1990), is also instructive.  The government there brought criminal charges involving organized crime and racketeering.

28

One of the issues that arose during trial was whether a particular witness's use of the phrase "strong arm" during a recorded conversation referred to extortion, or, alternatively, was a reference to a person's nickname.  The government, in support of the latter interpretation, sought to introduce a partially redacted newspaper article from the *Staten Island Advance* that described the person in question as the "strong arm" of an organized crime crew.  The district court admitted the article not for its truth, but rather for the purpose of showing that the purported nickname had in fact been used elsewhere.  The Second Circuit found no error on appeal, stating that the article was "confirmatory evidence" that would aid the jury in assessing the witness's credibility.  Id. at 1016 (quoting United States v. Iaconetti, 406 F. Supp. 554, 557 (E.D.N.Y. 1976)).

Finally, the Bankruptcy Court for the Eastern District of Virginia has also admitted newspaper articles for non-truth purposes, including "for the limited purpose of establishing what the government knew of or had read about the debtors' creditors at the time the petitions were filed, not for the truth of the assertions made therein."  In re Caucus Distributors, Inc., 106 B.R. 890, 920 (Bankr. E.D. Va. 1989).

Here, it is impossible to understand the defendant's actions at certain junctures, or his reasons for reaching out to particular coconspirators, without knowing that he was reacting to the publication of articles in the local newspaper.  Given that it would help the jury in understanding the progression of Mr. Burfoot's corrupt scheme, the government believes that the Court should admit these newspaper articles for the non-truth purpose of explaining the defendant's actions. To the extent the defendant expresses any concerns about juror confusion, the government would readily consent to a limiting instruction explaining its narrow purpose in offering this evidence.

**IV.    Conclusion**

Consistent with the preferences of the Court, the government is prepared to address these

evidentiary issues either before trial begins or as they arise.

Respectfully submitted,

Dana Boente
United States Attorney

By:    _____/s/_____

Melissa E. O'Boyle
Katherine Lee Martin
Uzo E. Asonye
Assistant United States Attorneys
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, Virginia  23510
Office:  (757) 441-6331
Fax:      (757) 441-6689
Email:   Melissa.oboyle@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on November 3, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the following:


Andrew M. Sacks
Sacks & Sacks
150 Boush Street, Suite 501
Norfolk, Virginia  23510
andrewsacks@lawfirmofsacksandsacks.com


                                           Dana J. Boente
                                           United States Attorney
By:             /s/
                                           Katherine Lee Martin
                                         Assistant United States Attorney
                                         United States Attorney's Office
                                         919 E. Main Street, Suite 1900
                                         Richmond, Virginia 23219
                                         Phone:  (804) 819-5400
                                         Fax:  (804) 819-7417
                                         katherine.martin@usdoj.gov